IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **AUBREY G. CARTER,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:22cv00001 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of** | ) | By: Pamela Meade Sargent |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Aubrey G. Carter, ("Carter"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Carter protectively filed his application for SSI[1] on October 9, 2019, alleging disability as of March 2, 2018, based on Marfan syndrome;[2] Tourette syndrome; panic attacks; vertigo; back problems; seizures; shoulder problems; scoliosis; depression; and migraines. (Record, ("R."), at 15, 199-202, 232, 251, 272.) The claim was denied initially and on reconsideration. (R. at 124-45.) Carter requested a hearing before an administrative law judge, ("ALJ"). (R. at 146.)

---

[1] On November 13, 2014, Carter protectively filed an application for SSI alleging disability as of January 31, 2005. (R. at 64.) By decision dated March 6, 2018, the ALJ denied Carter's claim. (R. at 64-78.) It does not appear that Carter appealed this decision.

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01, at *36960, 1991 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. § 416.920c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at https://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ noted the previous decision limited Carter to medium work. (R. at 24.) The ALJ found Carter had additional physical limitations that limited him to light work, particularly additional limitations on his ability to lift and carry items, as well as postural and exertional limitations. (R. at 24-25.) The ALJ further noted that the areas of mental functioning were consistent with the findings outlined in his 2021 decision. (R. at 25.)

[2] Marfan syndrome is a genetic condition that affects connective tissue, which provides support for the body and organs. *See* https://www.cdc.gov/heartdisease/marfan_syndrome.htm (last visited Mar. 7, 2023).

A hearing was held on August 11, 2021, at which Carter was represented by counsel. (R. at 34-60.)

By decision dated August 27, 2021, the ALJ denied Carter's claim. (R. at 15-27.) The ALJ found Carter had not engaged in substantial gainful activity since October 9, 2019, the application date. (R. at 17.) The ALJ determined Carter had severe impairments, namely, hypermobile joints; a left shoulder injury; right shoulder degenerative joint disease and arthrosis with surgery; lumbago; cervicalgia; syncope; substance use disorder; depression; anxiety; Tourette syndrome; and mild cognitive disorder, but he found Carter did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.)

The ALJ found Carter had the residual functional capacity to perform light[3] work, except he could not be exposed to hazards or unprotected heights; he could occasionally perform overhead reaching; he could have occasional exposure to extreme cold; he would be limited to instructions and tasks that could be learned in 30 days or less with only occasional decision making and changes in the work setting; he could not perform production rate or pace work, defined as having to keep up with an assembly line or in a job with strict daily or hourly quotas; and he could have no more than occasional interactions with the public and co-workers. (R. at 20.) The ALJ found Carter has no past relevant work. (R. at 26.) Based on Carter's age, education, work history and residual functional capacity and the testimony of a

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2021).

vocational expert, the ALJ found a significant number of jobs existed in the national economy that Carter could perform, including the jobs of a router, a marker, an addressing clerk and a document preparer. (R. at 26-27, 54-56.) Thus, the ALJ concluded Carter was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 27.) *See* 20 C.F.R. § 416.920(g) (2021).

After the ALJ issued his decision, Carter pursued his administrative appeals, (R. at 194-96), but the Appeals Council denied his request for review. (R. at 1-5.) Carter then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2021). This case is before this court on Carter's motion for summary judgment filed June 15, 2022, and the Commissioner's motion for summary judgment filed July 15, 2022.

## II. Facts

Carter was born in 1979, (R. at 26, 199), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He has a general educational development, ("GED"), diploma, and no past relevant work.[4] (R. at 38-39.) Carter stated he became depressed and attempted suicide by overdose over the passing of his parents, as well as the passing of an elderly woman for whom he provided care. (R. at 43.) He stated that, after his overdose, he began Suboxone treatment at ReVIDA Recovery. (R. at 49.) Carter stated he received counseling and treatment for depression and anxiety at Frontier Health. (R. at 49-50.) Carter stated his

---

[4] Carter stated the last time he worked a job was in 2005. (R. at 39.) He stated that, in 2019, he worked for his elderly neighbor by push mowing her lawn and weed eating. (R. at 39-40.)

medications helped his symptoms of depression and anxiety, but did not eliminate all his symptoms. (R. at 50.) He stated he continued to have suicidal thoughts, anxiety and panic attacks. (R. at 50-51.)

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Creekside Behavioral Health; Frontier Health; Norton Community Hospital; Community Orthopedics; Western Lee Community Health Clinic, ("Western Lee"); CVA Heart Institute; Holston Valley Medical Center, ("Holston Valley"); Southern Medical Group; ReVIDA Recovery; Wellmont Health System, ("Wellmont"); University of Virginia Health System, ("UVA"); Associated Orthopaedics of Kingsport, P.C., ("Associated Orthopaedics"); and Melinda M. Fields, Ph.D., a licensed psychologist.

By way of background, Carter reported he was involved in a motor vehicle accident[5] in 2003, which resulted in a head injury and internal injuries.[6] (R. at 38, 1148, 1195.) In June 2016, Carter was seen at UVA for bilateral shoulder pain, left greater than right. (R. at 791.) Carter reported his symptoms were aggravated by overhead reaching, rotating his shoulders and lifting. (R. at 791.) X-rays of Carter's left shoulder showed mild anterior subluxation of the humeral head on the axillary view. (R. at 803.) He was diagnosed with Marfan syndrome and left shoulder pain and instability, and conservative treatment was recommended. (R. at 792-93.) In September 2016, nerve conduction studies and a needle electromyography,

---

[5] Carter stated he had been drinking at the time of the accident. (R. at 1148.)

[6] The record does not contain medical records pertaining to this accident.

("EMG"), examination of the left upper extremity and cervical paraspinals were normal. (R. at 777.)

On August 15, 2017, Carter presented to the emergency department at Wellmont for complaints of syncope, chronic bilateral shoulder pain and dermatitis of the right eyelid. (R. at 865-72.) A CT scan of Carter's head was normal. (R. at 867.) Carter had minimal lower lid edema; he exhibited no tenderness to palpation in his cervical, thoracic and lumbar back; his cardiovascular examination was normal; he exhibited tenderness to palpation near the scapula and over the anterior shoulder joint, bilaterally, with limited range of motion; he was alert and fully oriented; he had no focal, motor or sensory deficits; his speech was fluent without slurring; and he had a normal mood, affect and behavior. (R. at 870-71.) Carter's bilateral shoulder pain was treated with steroids and anti-inflammatories. (R. at 871.)

On October 24, 2017, Dr. Joshua A. Yeary, D.O., a physician with Western Lee, saw Carter for complaints of multiple joint pain. (R. at 859.) Carter's physical examination was normal; he had appropriate judgment and good insight; he was fully oriented; his mood was euthymic; and his affect was appropriate. (R. at 862.) On November 2, 2017, x-rays of Carter's lumbar spine, cervical spine and bilateral shoulders were normal. (R. at 637.) On November 7, 2017, Carter complained of left shoulder and back pain. (R. at 625.) Carter's physical examination was normal; he had fair judgment and insight; he was fully oriented; his mood was a little anxious; and his affect was distracted. (R. at 628.) Dr. Yeary diagnosed Marfan syndrome with aortic dilation; generalized anxiety disorder; unspecified joint pain; major depressive disorder, recurrent, unspecified; syncope and collapse; and nicotine dependence. (R. at 628.)

On April 8, 2018, Carter presented to the emergency department at Norton Community Hospital for complaints of back, bilateral shoulder and head pain after falling down a flight of stairs while moving a couch. (R. at 553.) Diagnostic imaging[7] was normal, except x-rays of his lumbar spine showed mild disc height loss at the L4-L5 level. (R. at 536-51.) Carter's musculoskeletal system had normal strength and range of motion; he had a steady gait; he had no edema; he had point tenderness at the C5-C6 disc space; and he had generalized pain in his back and hip. (R. at 554, 556.)  He was diagnosed with cervical strain, muscle strain and contusions. (R. at 561.)

On April 24, 2018, Carter saw Dr. Yeary, reporting worsening anxiety. (R. at 618.) Carter's physical examination was normal; he had fair judgment and insight; he was fully oriented; his mood was anxious and depressed; and his affect was distracted. (R. at 620-21.) Dr. Yeary's diagnoses remained unchanged. (R. at 621.) On August 24, 2018, Carter complained of worsening back pain. (R. at 607.) Carter's gait was normal; he had paraspinal muscle spasm in the lumbar spine, but normal range of motion; he had fair judgment and insight; he was fully oriented; his mood was anxious and depressed; and his affect was distracted. (R. at 609.) Dr. Yeary diagnosed low back pain, ringworm and nicotine dependence. (R. at 609.) On August 27, 2018, x-rays of Carter's lumbosacral spine were normal. (R. at 636.) On September 21, 2018, Dr. Yeary noted that Carter was alert and fully oriented; his heart had normal rate and regular rhythm; he had appropriate judgment and good insight; his mood was a little anxious; and his affect was flat. (R. at 604-05.)

---

[7] This included imaging of Carter's shoulders, chest, pelvis and thoracic spine and CT scans of his head and cervical spine.

On February 1, 2019, Carter saw Dr. Yeary, reporting shoulder pain and stiffness with limited range of motion. (R. at 599.) Carter's gait was normal; his heart had normal rate and regular rhythm; he had paraspinal muscle spasm in the lumbar spine, but normal range of motion; he had appropriate judgment and good insight; he was fully oriented; his mood was a little anxious; and his affect was appropriate. (R. at 601.)

On February 27, 2019, Carter saw Dr. John R. Bertuso, M.D., a cardiologist with the CVA Heart Institute, for evaluation of Marfan syndrome with reported dilated aorta. (R. at 643.) Dr. Bertuso noted medical records from UVA indicated that Carter did not have Marfan syndrome,[8] and an echocardiogram was normal. (R. at 643, 758.) Carter's examination findings were normal. (R. at 646.) An electrocardiogram, ("EKG"), showed sinus rhythm. (R. at 646.) Dr. Bertuso recommended a CT angiogram of the chest and EKG to evaluate the possibility of a dilated aorta, and he ordered an event monitor. (R. at 647.)

On March 22, 2019, Carter was transferred from Holston Valley to Creekside Behavioral Health for an attempted suicide by overdose. (R. at 49, 413-31, 948-57.) Carter reported he had lost two family members the previous week, including his mother. (R. at 668.) It was noted that Carter received maximum benefit from his admission, and his symptoms had resolved. (R. at 356.) Upon discharge, Carter denied mania or depression symptoms, perceptual disturbances and suicidal and homicidal ideations, and he was diagnosed with bipolar disorder, current episode

---

[8] On September 22, 2016, Carter had a normal cardiac evaluation at UVA. (R. at 758.) Based on Carter's normal evaluation, his lack of family history of heart/vascular disease or sudden death and, few, if any, systemic features of Marfan syndrome, it was determined that Carter did not meet the diagnostic criteria for Marfan syndrome. (R. at 758.)

mixed, severe, with psychotic features. (R. at 356-57.) Subsequently, he started Suboxone treatment at ReVIDA Recovery[9] and counseling at Frontier Health.[10] (R. at 49.)

In April and May 2019, Carter was seen at Frontier Health for depression and anxiety.[11] (R. at 436-42, 448-54.) During this time, Carter was alert and fully oriented; he was well-groomed, cooperative and pleasant; his mood was anxious and depressed with a congruent affect; his thoughts were logical and well-organized; he made good eye contact; he conversed well; his speech was normal; his musculoskeletal system was within normal limits; he exhibited a vocal tic that worsened with anxiety; his memory was within normal limits; his attention and concentration were good; and he had good insight and judgment. (R. at 436-38, 442, 450.) It was noted that Carter was clinically stable. (R. at 442.) Carter was diagnosed

---

[9] Carter received Suboxone treatment from June 2019 through July 2021. (R. at 972-1039, 1054-1135, 1220-70.) Carter was friendly and attentive; he was alert and fully oriented; his speech was normal; his affect was appropriate with a congruent mood; he exhibited no signs of hallucinations, delusions, bizarre behaviors or other indicators of psychotic process; his thinking was logical; his thought content was appropriate; he exhibited no evidence of an affective or thought disorder; his judgment and insight were intact; he exhibited no signs of hyperactive or attentional difficulties, depression or mood elevation; his recent and remote memory were intact; and he showed no signs of withdrawal or intoxication. (R. at 976, 979, 984, 992, 994, 1003, 1008, 1023, 1034, 1061, 1064, 1074, 1077, 1087, 1099, 1108, 1118-19, 1127, 1135, 1223-24, 1226, 1254.)

[10] In May and June 2018, Carter was referred to Frontier Health by his probation officer. (R. at 471, 491.) Carter reported anxiety, depression, poor concentration and panic attacks. (R. at 471, 491.) Carter reported being molested multiple times as a child and being raped while incarcerated. (R. at 471, 491.) He was diagnosed with post-traumatic stress disorder, ("PTSD"). (R. at 471.)

[11] Carter failed to keep his appointments scheduled on May 16, 2019; June 18 and 28, 2019; July 22 and 30, 2019; and August 22, 2019. (R. at 440, 443-47.)

with bipolar disorder, current or most recent episode manic, severe; and major depressive disorder, recurrent episode with psychotic features. (R. at 449.)

On June 17, 2019, Carter saw Dr. Yeary, reporting low back pain. (R. at 595.) Carter's gait was normal, his heart had normal rate and regular rhythm, and he had paraspinal muscle spasm in the lumbar spine, but normal range of motion. (R. at 597.) Dr. Yeary diagnosed cervicalgia, low back pain and bilateral shoulder pain. (R. at 597.) That same day, x-rays of Carter's cervical spine showed mild degenerative disc changes and facet arthropathy in the mid cervical spine. (R. at 638.) X-rays of Carter's bilateral shoulders showed hook shaped acromion process mildly impinging on the subacromion space on both sides. (R. at 638.) X-rays of Carter's lumbosacral spine were normal. (R. at 638-39.)

On July 24, 2019, Carter saw Dr. James Price, M.D., a physician with Community Orthopedics, for evaluation of bilateral shoulder impingement syndrome. (R. at 518.) Carter's right shoulder had no acromioclavicular, ("AC"), joint hypertrophy or dislocation; he had tenderness at the AC joint, bicipital groove, subacromial bursa and supraspinatus muscle; he was alert and fully oriented; his mood and affect were normal; and his insight and judgment were intact. (R. at 520.) Dr. Price diagnosed impingement syndrome of both shoulders. (R. at 520.) On September 6, 2019, an MRI of Carter's right shoulder revealed severe subscapularis tendinosis; a posterior labral tear; mild AC joint degenerative changes; and mild subacromial/subdeltoid bursitis. (R. at 508-09.) On September 20, 2019, Carter saw Jeremiah Bush, P.A., a physician's assistant with Community Orthopedics, reporting pain and difficulty moving his shoulder. (R. at 514.) Carter's right shoulder had AC joint hypertrophy and distal clavicle deformity; he had tenderness at the anterior

glenohumeral joint, the deltoid muscle and the subacromial bursa with crepitus; he had painful and limited range of motion in all planes with diffuse weakness; he was alert and fully oriented; his mood and affect were normal; and his insight and judgment were intact. (R. at 516.) An injection to Carter's right shoulder was administered. (R. at 516.) Bush diagnosed impingement syndrome of the right shoulder, strain of the AC joint and glenoid labrum tear, subsequent encounter. (R. at 516.)

On October 24, 2019, Carter saw Bush, reporting continued shoulder pain and pain with overhead motion, which was "starting to affect his work." (R. at 511.) He stated the injection he received at his last visit helped for about two weeks. (R. at 511.) Carter reported anxiety, but denied sleep disturbance, depression, emotional problems and excessive stress. (R. at 511.) Carter had impingement, tendinopathy and partial rotator cuff tear of the right shoulder; his AC joint had hypertrophy; he had tenderness in the posterior glenohumeral joint, the subacromial bursa and the supraspinatus muscle with crepitus; he had painful and limited range of motion in all planes with diffuse weakness; he had a positive Painful Arc, a positive Neer test and a positive Empty Can Test; he was alert and fully oriented; his mood and affect were normal; and his judgment and insight were intact. (R. at 513.) Bush's diagnosis remained unchanged. (R. at 513.) On December 18, 2019, Carter underwent an arthroscopy right shoulder superior labrum, anterior to posterior, ("SLAP"), repair. (R. at 661-64, 918-47.)

On January 2, 2020, Carter saw Kyle J. Morgan, PA-C, a physician's assistant with Associated Orthopaedics, for follow up of his right shoulder labral repair. (R. at 959.) He reported a "little bit" of pain, but overall improvement. (R. at 959.)

Morgan denied Carter's request for Suboxone, but prescribed him a short dosage of narcotic pain medication. (R. at 959.) On February 27, 2020, Carter saw Morgan, and reported he had been doing "pretty well" up until a few days ago when he moved his shoulder and felt a pop. (R. at 958.) Carter's scars were well healed; he had intact sensation; he had tenderness to palpation over the anterior shoulder; and his shoulder had limited range of motion. (R. at 958.) A right shoulder injection was administered. (R. at 958.) Carter was diagnosed with right shoulder pain and muscle strain. (R. at 958.) Morgan noted it was likely Carter experienced some scar tissue stretch and should recover well. (R. at 958.)

On January 8, 2020, Dr. Yeary completed a mental assessment, finding Carter had marked limitations, resulting in an unsatisfactory work performance, in his ability to deal with the public; to use judgment in public; to deal with work stresses; to function independently; and to understand, remember and carry out complex job instructions. (R. at 735-36.) Dr. Yeary opined that Carter retained a satisfactory ability to make all other occupational, performance and personal/social adjustments, except for understanding, remembering and carrying out simple job instructions and maintaining personal appearance, which he opined Carter generally could perform well. (R. at 735-36.) He found Carter would be absent from work more than two days a month. (R. at 737.) Dr. Yeary noted this assessment was based on his review of his office notes and reports. (R. at 736-37.)

On January 27, 2020, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Carter had mild limitations in his ability to understand, remember or apply information and to adapt or manage himself; and moderate limitations in his ability to interact with others and

to concentrate, persist or maintain pace. (R. at 89-90.) Leizer noted that Carter had multiple past claims, and his focus over the previous 10 years was to obtain disability. (R. at 89.) He noted that Carter's mental status examinations largely were normal throughout this time. (R. at 89.) Leizer noted Carter's allegations that he suffered physical and mental problems because of a 2003 motor vehicle accident, but his examinations failed to show any severe long-lasting deficits. (R. at 89.) He noted that, while Carter was hospitalized for a week in March 2019 following an overdose of pain medications, after treatment, his mood improved significantly. (R. at 89.) Carter's subsequent appointments showed him to have a normal mental status and no mental health complaints. (R. at 89-90.) On October 29, 2020, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Leizer. (R. at 108-09.) Milan noted Carter could understand, remember and carry out simple tasks on a regular, ongoing basis. (R. at 108.)

Leizer also completed a mental assessment on January 27, 2020, finding Carter had moderate[12] limitations in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. at 92-94.) Leizer stated Carter's work-related mental abilities were, otherwise, not significantly limited. (R. at 93-94.) On October 29, 2020, Milan completed a mental assessment, which mirrored Leizer's assessment. (R. at 113-15.)

---

[12] The regulations define "moderate limitations" as those resulting in a fair ability to function independently, appropriately, effectively and on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2021).

On January 27, 2020, Dr. Richard Surrusco, M.D., a state agency physician, found Carter could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; sit and stand and/or walk up to six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; and occasionally reach overhead, bilaterally. (R. at 91-92.) Dr. Surrusco indicated no postural, visual, communicative or environmental limitations. (R. at 92.) He noted the medical evidence of shoulder impingement supported his findings. (R. at 92.)

On October 8, 2020, Carter saw Dr. Yeary, reporting that his right shoulder was doing well since having surgery. (R. at 967.) Carter's physical examination was normal, except for lumbar paraspinal muscle spasm; he had appropriate judgment and good insight; he was fully oriented; his mood was a little anxious; and his affect was appropriate. (R. at 969.)

On October 10, 2020, Dr. Jacob A. Nysather, D.O., a physician with Southern Medical Group, saw Carter at the request of Disability Determination Services. (R. at 743-48.) Carter alleged disability due to back and shoulder pain and Marfan syndrome. (R. at 743.) He was independent with his activities of daily living. (R. at 744.) Carter was in no acute distress; he ambulated without assistance; his cardiovascular examination was normal; he had decreased range of motion of the cervical spine and bilateral shoulders, right greater than left; he had a normal gait; he was able to rise from a sitting position without assistance, stand on tiptoes, heels and tandem walk without problems; he was able to bend and squat without difficulty; his grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; he was fully oriented and cooperative; he did not appear depressed or anxious; he was able to communicate with no deficits; his recent and

remote memory were intact; he had good insight and cognitive function; he had good tone and full strength, bilaterally, in all muscle groups; he had no abnormal reflexes; and he had intact sensation. (R. at 744-45.) Dr. Nysather diagnosed Marfan syndrome; bilateral shoulder arthritis with tendon weakness status-post right SLAP repair in relation to Marfan syndrome; lumbago; cervical radiculopathy; anxiety; and tobacco dependency. (R. at 745.)

Dr. Nysather opined Carter could sit for a full workday; he could walk and/or stand up to a half workday with breaks; he could lift and carry items weighing up to five pounds; he should limit lifting objects off the ground and above head; he could perform, but should limit, activities involving squatting, crawling and stooping; he could respond appropriately to questions; he could carry out and remember instructions; and he had preserved mental status with appropriate orientation, affect, thought content, memory and fund of information.  (R. at 745-46.) Dr. Nysather based his opinion on his examination findings and after reviewing the objective evidence. (R. at 745.)

On October 16, 2020, Dr. Jack Hutcheson, M.D., a state agency physician, found Carter could lift and carry items weighing up to 10 pounds occasionally and up to 10 pounds frequently; sit up to six hours in an eight-hour workday; stand and/or walk up to four hours in an eight-hour workday; occasionally push/pull and reach overhead with his bilateral upper extremities; occasionally climb, balance, stoop, kneel, crouch and crawl; and avoid concentrated exposure to extreme cold and hazards, such as machinery and heights. (R. at 110-13.) Dr. Hutcheson indicated no visual or communicative limitations. (R. at 112.) He noted the medical evidence of shoulder impingement, lumbago and cervical radiculopathy limited Carter to light

work. (R. at 112-13.) Dr. Hutcheson noted these limitations were consistent with the total medical and nonmedical evidence, including statements by Carter and others, observations regarding Carter's activities of daily living and alterations of usual behavior or habits. (R. at 113.) He noted the medical evidence of record supported his residual functional capacity findings. (R. at 113.)

On October 19, 2020, David Dietrich, Ph.D., a licensed clinical psychologist, evaluated Carter at the request of Disability Determination Services.[13] (R. at 750-54.) He denied ever having attempted suicide. (R. at 751.) Carter had a normal gait; he made appropriate eye contact; his hygiene and grooming were good; he exhibited no psychomotor abnormalities other than a minor vocal tic; his mood was reported as generally "fair" and currently "good;" his affect was normal; his speech was normal; his thought content and process and perception were normal; he was fully oriented; his attention span was intact; his short-term memory was mildly limited, as he could recall only one of three words after five minutes; and his recent and remote memory were intact. (R. at 751-52.) Carter scored 24/27 on the Mini-Mental State Exam, ("MMSE"),[14] and Dietrich assessed his intelligence in the borderline range. (R. at 752.)

---

[13] While the evaluation report also has Wade Smith, M.S., a licensed senior psychological examiner, as an evaluator in addition to Dietrich, Dietrich signed the report. (R. at 754.)

[14] The MMSE is an 11-question measure that tests seven areas of cognitive function: orientation, registration, attention and calculation, recall, language and visual construction. The maximum score is 30. A score of 24 or more is indicative of no cognitive impairment. *See* https://www.sralab.org/rehabilitation-measures/mini-mental-state-examination (last visited Mar. 7, 2023).

Dietrich opined Carter's fine- and gross-motor skills were normal; he could comprehend and follow simple and some detailed job instructions; his concentration and persistence "appear" mildly to moderately impaired by anxiety, but were adequate to meet the demands of simple and some detailed work-related decisions; he had a moderately impaired ability to interact with others in an appropriate manner; and his physical and psychiatric problems "may detract" from his ability to maintain attendance and meet an employment schedule. (R. at 753.) Dietrich diagnosed somatic symptom disorder, persistent, mild; unspecified anxiety disorder; and persistent vocal tic disorder. (R. at 753-54.)

From December 2020 through July 2021, Carter sought counseling at Frontier Health for mood swings and depression.[15] (R. at 1136-67, 1177-88, 1274.) Carter reported he heard his deceased father's voice a few times each year. (R. at 1143, 1147.) He reported "doing okay," as his medications controlled his symptoms. (R. at 1142-43, 1146, 1177, 1184.) He reported various activities, such as assisting his neighbors with various tasks, including taking them to the store and to their appointments and doing home and property repairs; he took care of a puppy; he stayed busy working on vehicles and going to auctions; and he collected antiques. (R. at 1140, 1142-46, 1184, 1188, 1274.) During this time, Carter was well-groomed; friendly, pleasant and conversed well; he was fully oriented; his mood was euthymic and anxious with an appropriate affect; his thoughts were logical and organized; his memory was within normal limits; his attention and concentration were good; and he had fair to good insight and judgment. (R. at 1137, 1139-40, 1142-46, 1149, 1155,

---

[15] Carter stated he had filed for disability, and his attorney wanted him to start outpatient psychiatric services. (R. at 1147, 1159.

1179.) It was noted that Carter was clinically stable. (R. at 1140, 1142-46, 1184, 1188.)

On June 2, 2021, Carter saw Dr. Price, reporting left shoulder pain. (R. at 1168.) Carter's Phalen's sign was positive,[16] and his left shoulder had tenderness in the AC joint and decreased sensation. (R. at 1171.) X-rays of Carter's left shoulder showed AC arthritis and some mild glenohumeral arthritis. (R. at 1175-76.) Dr. Price diagnosed chronic left shoulder pain; arthritis of the left AC joint; impingement syndrome of the left shoulder; and carpal tunnel syndrome of both wrists. (R. at 1174.)

On July 7, 2021, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Carter at the request of Disability Determination Services. (R. at 1193-1201.) Carter denied involvement in inpatient or outpatient substance abuse treatment and denied use of illicit substances or abuse of prescription medications. (R. at 1195.) Carter's hygiene and grooming appeared good; he was pleasant, polite and cooperative; he had adequate eye contact; he was fully oriented; he occasionally emitted soft vocal sounds, including a throat clicking sound and throat clearing; he exhibited frequent blinking; his mood was depressed, as evidenced by facial expression; he was anxious and displayed hand tremors; his affect was congruent to mood; his stream of thought was organized and logical; he exhibited no evidence of a thought content impairment or perceptual disturbances; his judgment was impaired, as evidenced by responses to presented scenarios; his immediate memory was normal; his recent recall was impaired, as he could recall only one of four words after a delay; his remote recall

---

[16] A positive Phalen's sign indicates carpal tunnel syndrome. *See* https://www.physio-pedia.com/Phalen's_Test (last visited Apr. 13, 2023).

was impaired; and his pace and gait were slow. (R. at 1197-98.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Carter obtained a full-scale IQ score of 71. (R. at 1198-99.) Fields diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; panic disorder; rule out PTSD; mild neurocognitive disorder due to traumatic brain injury; and rule out unspecified tic disorder. (R. at 1200-01.)

That same day, Fields completed a mental assessment, finding Carter had marked limitations, resulting in an unsatisfactory work performance, in his ability to relate to co-workers; to deal with the public; to use judgment in public; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1190-92.) Fields opined that Carter retained at least a satisfactory ability to make all other occupational, performance and personal/social adjustments. (R. at 1190-91.) Fields found Carter would be absent from work more than two days a month. (R. at 1192.) Fields based these findings on Carter's panic attacks; impaired social functioning, judgment and recent and remote memory; traumatic brain injury;[17] and major depressive symptoms. (R. at 1191-92.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2021). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62

---

[17] In her written report, Fields noted she did not have records pertaining to Carter's traumatic brain injury. (R. at 1195.)

(1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently

explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Carter filed his application in October 2019; thus, 20 C.F.R. § 416.920c governs how the ALJ considered the medical opinions here.[18] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 416.920c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2021).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 416.920c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical

---

[18] 20 C.F.R. § 416.920c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[19] *See* 20 C.F.R. § 416.920c(b)(2).

Carter argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Dr. Nysather, Dr. Yeary and Fields. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Based on my review of the record, I agree. As noted above, the new regulations require ALJs to explicitly discuss the supportability and consistency of medical opinions. *See* 20 C.F.R. § 416.920c(b)(2) ("… we will explain how we considered the supportability and consistency factors for a medical source's medical opinions"). Not only must an ALJ consider the five factors set forth in the regulation, the ALJ must – at a minimum – explain his consideration of the supportability and consistency factors. *See Garrett v. Kijakazi*, 2022 WL 1651454, at *2 (W.D. N.C. May 23, 2022); *see also Dany Z. v. Saul*, 531 F. Supp. 3d 871, 883-84 (D. Vt. 2021) (explaining that failure to "explicitly discuss the supportability and consistency of

---

[19] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(b)(3) (2021).

medical opinions" can result in remand). Although the ALJ referenced the opinions of Dr. Nysather and Dr. Yeary, in the context of his decision, he did not specifically make a finding as to the persuasiveness and consistency of their findings and opinions. (R. at 25.)

In January 2020, Dr. Yeary found Carter had marked limitations, resulting in an unsatisfactory work performance, in his ability to deal with the public; to use judgment in public; to deal with work stresses; to function independently; and to understand, remember and carry out complex job instructions. (R. at 735-36.) The ALJ noted this opinion was more limited than necessary given the multiple mental status findings showing Carter's mental status to be intact and his ability to interact appropriately. (R. at 25.) The ALJ did not address the supportability or consistency of Dr. Yeary's opinion as to Carter's residual functional capacity.

In July 2021, Fields opined that Carter had marked limitations, resulting in an unsatisfactory work performance, in his ability to relate to co-workers; to deal with the public; to use judgment in public; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. The ALJ noted he found Fields's July 2021 opinion unpersuasive, as her evaluation was based on information provided by Carter that was inconsistent with the remainder of the record. (R. at 26.) For example, Carter denied involvement in inpatient or outpatient substance abuse treatment and use of illicit substances or abuse of prescription medications, and the record shows he reported multiple times that he and his partner stayed busy doing odd jobs for friends

and neighbors. (R. at 26.) While this statement might suffice as an analysis of the consistency of Fields's opinions, it did not address the supportability of her opinions.

In October 2020, Dr. Nysather opined Carter could sit for a full workday; he could walk and/or stand up to a half workday with breaks; he could lift and carry items weighing up to five pounds; he should limit lifting objects off the ground and above head; he could perform, but should limit, activities in a squatting, crawling and stooping position; he could respond appropriately to questions; he could carry out and remember instructions; and he had preserved mental status with appropriate orientation, affect, thought content, memory and fund of information. The ALJ noted this opinion was an "exaggeration of [Carter's] limitations in regard[] to the lifting and carrying." (R. at 25.)

This is the entirety of the ALJ's evaluation of the opinions of Drs. Yeary and Nysather and Fields. I find that this is not a sufficient analysis to allow the court to "trace the path" of the ALJ's reasoning regarding the supportability or the consistency of these opinions. While it could be construed that the ALJ addressed the consistency factor concerning the opinions of Dr. Yeary by referencing Carter's ability to perform activities as outlined in the decision and his "multiple mental status findings" showing Carter's mental status was intact, (R. at 25), the ALJ's evaluation of these opinions is devoid of any explanation whether he considered the supportability factor in evaluating their persuasiveness, and he failed to discuss these providers' explanations offered in support of their opinions. In addition, the ALJ failed to articulate how he considered the consistency and supportability factors concerning Dr. Nysasther's opinion and the supportability factor concerning Fields's opinion. (R. at 25.) Because the ALJ was required to articulate how he considered

the consistency and supportability factors, he did not apply the correct legal standard in resolving Carter's claim.

Thus, I find that the ALJ failed to build the requisite logical bridge between any discussion of the record evidence and the question whether these opinions were consistent with the evidence under the circumstances. While the ALJ need not necessarily use the words "supportability" and "consistency" in his persuasiveness analysis, his evaluation must allow the court to make a meaningful review without having to fill in the gaps of his reasoning or bolster an inadequate opinion. I find that the court would be doing both things regarding the ALJ's analysis of these opinions.

Based on the above, I find that substantial evidence does not exist to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.  An appropriate Order and Judgment will be entered.

DATED:     April 17, 2023.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE